LANDRY, Judge.
Plaintiffs in these consolidated cases appeal dismissal of their respective actions for damages arising from a head-on automobile collision. The accident occurred at approximately 1:15 A.M., December 15, 1968, on U. S. Highway 61, a two-lane, blacktop highway, at a point ten miles north of St. Francisville, Louisiana. The situs of the accident was a straight but 2° inclined segment of the highway. The accident occurred when a southbound Chevrolet driven by Herman Jones collided with a northbound Oldsmobile being operated by defendant Minor. Herman Jones was killed in the collision.
The Jones vehicle was also occupied by guest passenger-plaintiffs, Jimmie Jones, L. T. Banford, Emma Banford and Jerry Nixon, all of whom seek recovery from Minor and his insurer, The Fireman’s Insurance Company of Newark (Fireman’s). Queenie Jones, widow of Herman Jones, also seeks recovery from Minor and Fireman’s on behalf of herself and her two minor children, Glenn Jones and Jerry Lee Jones. We affirm the judgment below.
Herman Jones, being uninsured, Minor third partied his insurer, Fireman’s, pursuant to an uninsured motorist clause in Minor’s policy, seeking recovery from third party defendant on the ground that Jones was solely at fault in causing the accident. It was stipulated between Minor and Fireman’s that if Jones were held solely at fault, Fireman’s liability to Minor would be $4,-000.00. The trial court absolved Minor of fault and rendered judgment in his favor against Fireman’s in the sum stipulated.
This appeal presents solely a question of fact, namely, which vehicle was proceeding in the wrong lane of travel.
It is conceded that the drivers of both vehicles were intoxicated at the time of the accident.
Emma Banford testified in essence that she had no independent recollection of the events surrounding the accident.
Jerry Nixon was seated in the middle of the front seat of the Jones vehicle. He testified unequivocally that Jones was proceeding in his proper lane of travel at the moment of impact. He observed the lights of the oncoming northbound Minor vehicle, but did not see the approaching car cross the center line of the highway. In substance, his testimony is that the accident happened so fast he could not tell much about it.
L. T. Banford was seated on the right side of the rear seat of the Jones automobile. He stated that Jones was driving south in his proper lane of travel. Banford observed the oncoming Oldsmobile ap *902 proaching in the wrong lane of travel before the impact.
Jimmie Jones, brother of decedent Herman Jones, occupied the right side of the front seat of the Chevrolet. He testified his brother was driving south in the southbound lane. He also stated that upon topping a slight hill or rise, his brother called his attention to the impending collision by declaring: “Looks like he is on our side” and “Watch out.” Jones could recall nothing further except that he was certain Minor was approaching in the wrong lane of travel.
Matthew Pate, part time Deputy, was the first police officer to arrive upon the scene. He remained at the site approximately 15 minutes during which time he aided the injured and directed traffic. Deputy Pate did not make a detailed investigation. He observed that while there was some debris in the southbound lane, most of the wreckage was in the east or northbound lane. Upon this observation, he concluded the impact occurred in the northbound lane of travel. He also stated that he assisted in removing some of the rubble from the highway to permit passage of traffic.
Trooper E. G. Stuard, State Policeman, testified that he arrived at the scene at approximately 1:50 A.M. He found the Jones vehicle on the west side of the highway, its front partially in the road, headed in a southerly direction. He noted the Minor vehicle on the east side of the road, partially on the highway, and pointed in a northerly direction. Both vehicles were heavily damaged on the left front side. Stuard found debris scattered over the entire highway. He could not determine the point of impact in the dark. The night being extremely cold, he remained only so long as was necessary to care for the injured and clear the roadway for traffic. He returned the next morning at about 10:00 A.M. to continue his investigation. He found the following physical evidence: (1) a large concentration of dirt near the shoulder of the southbound lane; (2) gouge marks in the northbound lane; (3) scuff marks near the center of the road leading to the Minor vehicle’s resting place following the accident, and (4) gouge marks in the southbound lane. No skid marks were found. Stuard was of the opinion that a long scuff mark beginning lightly in the southbound lane and becoming darker in the northbound lane was made by the Minor car. He also believed that a deep gouge mark in the northbound lane, running away from the center toward the east edge of the highway, was made by Minor’s automobile. He believed the gouge marks in the southbound lane were made either by the Jones vehicle or by both automobiles at the moment of impact. Based on these observations, Stuard concluded the collision occurred in the southbound lane.
Mr. Alvin Doyle, engaged by defendants to investigate the accident, commenced his probe two days thereafter. He testified that Trooper Stuard pointed out to him the location of the vehicles following impact. By measurement, Doyle determined the vehicles came to rest fifty feet apart. He observed that a collision left front to left front would produce counter-clockwise movement of the vehicles involved. He found that the physical evidence and resting places of the vehicles following the accident corresponded with this principle. Mr. Doyle noted the following physical evidence at the scene: (1) a gouge mark 54" deep, 2" wide, and 46" long beginning 26" east of the center line of the road and ending 51" east thereof; (2) seven or eight gouge marks in the center of the southbound lane; (3) light gouge marks that crossed the center line of the highway; (4) a scuff mark which commenced inside the northbound lane, continued south 18 feet, and crossed the center line of the road — at its beginning point, the line was very dark, but lightened as it proceeded southerly; (5) an S shaped scuff mark in the northbound lane, beginning 32 inches from the east edge of the highway and continuing 10 feet to a point where it left the' highway, said mark being 11 inches wide at its beginning, and 17 inches wide at the point where it left the highway.
*903 Doyle’s inspection of the vehicles revealed that the left frame rail of the Minor vehicle was bulged out significantly. Photographs in evidence confirm this observation. Doyle attributed the collapse of the left rail of the Minor car to the hard impact to the vehicle’s left front in the collision. Examination of the underside of the Minor car disclosed that only its left frame rail contacted the ground in the collision. This circumstance was established by the finding that asphalt particles were detected only on the bottom edge of the left frame rail of the automobile. Measurement of the frame rail of Minor’s car revealed it to be two inches wide. The gouge mark ¼ inch deep, two inches wide and 46 inches long, in the northbound lane, was in Doyle’s opinion, made by the left frame rail of the Minor car. Inspection of the wheels of the Minor automobile disclosed that all were free turning except the left front wheel which was rubbing slightly. Doyle concluded that since this vehicle’s wheels were not jammed or locked following impact, they would not likely cause scuff marks. In Doyle’s opinion, the S shaped scuff marks in the northbound lane were made by the rear wheels of the Minor vehicle as it skidded off the road following the collision.
Doyle also examined the underside of the Jones vehicle. He found that the bumper, muffler and both frame rails contacted the surface of the road. The universal joint was bent and the engine locked and cocked sideways. This condition indicated that the rear wheels of the Jones car were locked after the impact. Numerous photographs introduced in evidence confirm Doyle’s conclusion that the left front tire on the Jones car was dragged for some distance after the collision. Doyle explained that scuff marks, unlike skid marks, begin heavily and end lightly. He also explained that upon impact, considerable heat is generated between a vehicle’s tires and the road surface, leaving dark marks which lighten as the vehicle travels after the collision. Since the 18 foot scuff mark began heavily in the northbound lane, Doyle concluded the point of impact occurred at the darkest portion of this mark which was in the northbound lane.
In Doyle’s opinion, the Jones vehicle spun out in the southbound lane, and came to rest on the west shoulder of the highway following the impact. This direction of travel, he noted, corresponds with the 18 foot scuff mark which proceeded from the northbound lane into the southbound lane. Considering the direction of travel of the Jones car, and the fact that its left front tire showed evidence of dragging, Doyle concluded the Jones vehicle was in Minor’s lane of travel at the moment of impact. Doyle was of the opinion that the gouge marks which led from the northbound lane into the southbound lane, and the numerous gouge marks found in the southbound lane, were made by the Jones vehicle because the underside of the Jones car showed numerous signs of contact with the road surface. Based on the finding that only the left frame rail of the Minor vehicle came in contact with the roadway, Doyle concluded that the Minor car did not make the gouge marks leading from the northbound lane to the southbound lane. Doyle also noted that the dark part of the 18 foot scuff mark (which indicated the point of impact) was ahead of the 2 inch wide gouge mark found in the northbound lane. He explained that gouge marks would necessarily occur behind the point of impact, and that the 2 inch gouge mark in the northbound lane could only have been made by the left frame rail of the Minor car. This, he stated, conclusively established that the Minor car was in the northbound lane at the time of collision.
The trial court discounted the testimony of the occupants of the vehicles involved on the ground that such testimony shed little, if any, light on the matter. With this conclusion, we agree.
We also find no error in the trial court rejecting Stuard’s explanation of the point of impact, and accepting Doyle’s evidence on this vital issue. In this instance, *904 Doyle’s investigation appears most thorough. His analysis of the physical facts gleaned from his investigation and minute inspection of the vehicles involved appears both logical and in accord with the facts thereby disclosed. On the other hand, Trooper’s Stuard’s investigation was comparatively superficial.
It is settled law that the findings of the trier of fact will not be disturbed unless it is shown to be manifestly erroneous. Readco Industries, Inc. v. Myrmax Specialties, Inc., La.App., 236 So.2d 573. In this instance, we find no error whatsoever in the conclusion reached by the court below. On the contrary, we are in agreement therewith.
It is ordered, adjudged and decreed that the judgments rendered in these consolidated cases rejecting plaintiffs’ demands, in each instance, be affirmed.
It is further ordered, adjudged and decreed that:
(1) Jimmie Jones pay one-fifth of the transcript cost herein, the entire expert witness fee awarded Dr. Vincent Lagattuta, and all costs directly attributable to Suit Number 4308;
(2) Plaintiff Queenie Jones shall pay one-fifth of the cost of the transcript herein, and all costs directly attributable to Suit Number 4309;
(3) Plaintiff L. T. Banford shall pay one-fifth of the cost of the transcript herein, one-half the expert witness fee awarded Dr. Howard Martin, and all costs directly attributable to Suit Number 4431;
(4) Plaintiff Emma T. Banford shall pay one-fifth of the cost of the transcript herein, all of the expert witness fee awarded Dr. Karl J. Pizzalotta, one-half the expert witness fee awarded Dr. Howard Martin, and all costs directly chargeable to Suit Number 4432, and
(5)Plaintiff Jerry Nixon shall pay one-fifth of the cost of the transcript herein, the entire expert witness fee awarded Dr. Arthur A. Mauterer, and all costs directly chargeable to Suit Number 4433.
Affirmed.